## Norfolk

RICHARD KEITH BELL

v.

COMMONWEALTH OF VIRGINIA

No. 0080-84

Decided March 18, 1986

■■

COUNSEL

Vincent A. Bertolini, for appellant.

Thomas C. Daniel, Assistant Attorney General (William G. Broaddus, Attorney General, on brief), for appellee.

OPINION

**BAKER, J.**—This is an appeal by Richard Keith Bell (Bell) from a judgment of the Circuit Court of the City of Norfolk which approved a jury verdict convicting Bell of second-degree murder and the use of a firearm in the commission of a felony. Bell first alleges that the trial court erred in holding that the evidence was sufficient to convict him of second-degree murder and in ruling that his claim of self-defense did not as a matter of law excuse or justify his shooting and fatally wounding Kenton Dean Smith (decedent). He further alleges that even if the trial court was correct in those rulings, it erred when it failed to properly instruct the jury on the issue of self-defense. We find that both contentions are without merit and affirm.

■ There was substantial disparity in the testimony presented at trial; however, because the jury found adversely to Bell, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the Commonwealth. *Stockton v. Commonwealth*, 227 Va. 124, 145-46, 314 S.E.2d 371, 385, *cert. denied*, 469 U.S. 893 (1984); *Patler* v. *Commonwealth*, 211 Va. 448, 457, 177 S.E.2d 618, 624 (1970), *cert. denied*, 407 U.S. 909 (1972). Thusly viewed that evidence is as follows:

During the early morning hours of Sunday, March 11, 1984, Bell fired the shot that fatally wounded the decedent. The medical examiner established decedent's cause of death as internal bleeding stemming from a single gunshot wound to the chest. The bullet, recovered inside decedent's chest, traversed his chest from right to left. It injured the lungs, ribs, vertebra and spinal cord. The medical examiner opined that the spinal cord injury would

have caused decedent to fall down immediately upon receiving the wound.

For several years prior to March 1984, Bell and decedent had been rivals in a triangle consisting of those two and Patricia Lee Smith (Patricia). In that affair, decedent had prevailed and he and Patricia were married in November 1981. The marriage was not successful. In February 1983, the parties separated and Patricia filed for divorce. The divorce was never finalized.

During this period, Bell moved to California. After Patricia's separation from the decedent, she resumed her relationship with Bell, including a visit to California to see him. Shortly after her visit she and Bell returned to Norfolk, Virginia, and the triangle was revived.

At the beginning of the renewed rivalry, angry and threatening words were passed between the men and from Bell to Patricia. The threatening words heightened in mid-January 1984 when Patricia's interest again favored decedent as they began to consider reconciliation. Approximately one month prior to decedent's death, Patricia told Bell of her intent and he answered by saying: "[I]f you go back to Kenton (decedent), you are a fool and I am going to kill him and you, too." This threat was repeated to Patricia by Bell at her place of work on March 10, 1984, the evening immediately prior to the firing of the shot which fatally wounded decedent. Patricia repeatedly asked Bell to leave decedent and her alone.

During the time of the latest rivalry, Bell purchased a .380 caliber automatic pistol and carried it in the glove compartment of his van. It was this gun that fired the fatal shot.

Decedent arrived at Patricia's place of employment around 11:45 p.m. on March 10, 1984, and assisted her in stocking merchandise and closing the store. The two departed together between 12:30 a.m. and 12:45 a.m. on March 11, 1984. Upon their departure, decedent handed Patricia a .22 caliber pistol and asked that she put it in her purse. They traveled to the parking lot of a local tavern adjacent to East Little Creek Road. Patricia then placed the pistol on the vehicle's front seat. She testified that she placed the pistol on the seat in anticipation of locking it in the trunk when they entered the tavern. They delayed entering the tavern

until they finished consuming cans of beer they had opened.

As they drank together, Patricia told decedent that she thought she saw Bell's van pass by, traveling east on Little Creek Road. He then drove their car from the tavern lot and into eastbound traffic. The two lost sight of what they thought was Bell's van and returned to the tavern lot.

On two additional occasions that night, Bell returned to the area of the tavern lot where decedent and Patricia were parked. Each time they made an attempt to follow Bell's van but failed to find it. They then decided to abandon the chase and selected a different place to park. They drove to and parked on a bank lot away from the tavern. Patricia then sighted Bell driving his van past the bank lot. She observed him turn his vehicle, jump the median strip while making a U-turn, and drive into the bank lot where she and the decedent were parked.

As Bell drove onto the lot, seated beside him was his friend and passenger, Eddie Copeland. Bell asked Copeland to remove the gun from the van's glove compartment. The loaded gun was placed on the van's floor next to Bell's seat. He proceeded to drive in circles around decedent's car, calling out insulting words and daring decedent to show "[w]hat he was going to do about it." As he circled their car, both decedent and Patricia asked Bell to leave them alone. Instead, Bell parked his vehicle parallel to decedent's car approximately twenty-five feet away, with the motor still running. He then took the gun into his hand, cocked it and awaited the decedent's response to the challenge he had made.

The decedent left his car with his pistol held by his side, and took two or three steps toward Bell's van. Bell, still seated behind the wheel of his van with the motor running, raised his gun and fired at the decedent, inflicting the fatal wound. Bell immediately drove his vehicle from the lot. A passing police officer heard gun shots and observed Bell drive from the lot at a high rate of speed. He pursued and apprehended Bell a short while later.

Bell's testimony was inconsistent. At one point he claimed that he entered the bank lot because he was afraid that the decedent might be doing some harm to Patricia. Later he stated that he entered the lot because the decedent had been calling him on the telephone and threatening his life. Bell gave a transcribed state-

ment to the Norfolk police in which he confirmed the latter as his reason for entering the bank lot. In that statement he also described the encounter as a "freak accident" but acknowledged circling decedent's car.

In his testimony, Copeland admitted telling the police that Bell had followed decedent's vehicle for approximately thirty minutes prior to the shooting and acknowledged that Bell had used vile and taunting language toward decedent while circling decedent's vehicle.

## I.

■ Bell argues that there was not sufficient evidence at trial to support a verdict of second-degree murder. The record disclosed that the Commonwealth proved that Bell was the person who deliberately fired the shot which fatally wounded the decedent.

> When the Commonwealth has proved the commission of a homicide, and has pointed out the accused as the criminal agent, then it may rest its case, and unless the accused shows circumstances of justification, alleviation or excuse, a verdict of murder in the second degree will be warranted.

*Boone* v. *Commonwealth*, 195 Va. 708, 712, 80 S.E.2d 412, 414 (1954) (quoting *Johnson* v. *Commonwealth*, 188 Va. 848, 853-54, 51 S.E.2d 152, 154 (1949)); *see also Braxton* v. *Commonwealth*, 195 Va. 275, 279, 77 S.E.2d 840, 842 (1953).

■ In Virginia, every unlawful homicide is "presumed" to be murder in the second-degree. *Blankenship* v. *Commonwealth*, 193 Va. 587, 591, 70 S.E.2d 335, 337 (1952). The so-called "presumption," however, amounts to no more than an "inference" which the trier of fact is permitted, but is not required, to draw from proven facts. *Hodge* v. *Commonwealth*, 217 Va. 338, 343, 228 S.E.2d 692, 695 (1976). The constitutional guarantee of due process is protected if the evidence necessary to invoke the presumption or inference is sufficient for a rational juror to find the presumed or inferred fact beyond a reasonable doubt. *Hodge*, 217 Va. at 344, 228 S.E.2d at 695.

■ Even with the operation of the presumption or inference, the ultimate burden of persuasion of defendant's guilt remains upon

the Commonwealth throughout the trial and never shifts; however, the burden of producing some evidence contesting the otherwise presumed or inferred fact may shift to the defendant once he is shown to be the criminal agent who killed the decedent. *Id.* at 341-42, 228 S.E.2d at 695.

■ The trial court apparently concluded that the defendant had met his burden of producing some evidence contesting the presumption or inference of second-degree murder since it did instruct the jury on the issues of excusable or justified homicide. It does not follow, however, that just because the burden of producing some evidence of justification or excuse has been met that the Commonwealth, as a matter of law, has failed to carry its burden of proof on the question of guilt. "If the evidence so offered by the accused is shown to be false, and is insufficient to cause the jury to have a reasonable doubt as to his guilt, the case so made by the Commonwealth is not overcome, and a verdict of second-degree murder is still warranted." *Johnson* v. *Commonwealth*, 188 Va. 848, 853-54, 51 S.E.2d 152, 154 (1949). If from the improbability of his story and his manner of relating it, or from the contradictions within itself or by other credible evidence, or from the attending facts and circumstances, reasonable men might believe that the justification, alleviation or excuse offered by the defendant was not true, the jury has a right to reject it, leaving the presumption or inference of second-degree murder to stand. *See Randolph* v. *Commonwealth*, 190 Va. 256, 263, 56 S.E.2d 226, 229 (1949); *Boone* v. *Commonwealth*, 195 Va. at 712, 80 S.E.2d at 414; *Braxton* v. *Commonwealth*, 195 Va. at 279, 77 S.E.2d at 842.

The accused's own explanation of how the killings occurred leave the credibility of his account of what transpired a question to be passed upon by a jury under proper instructions. The jury then is the final judge of the degree of the accused's guilt or his innocence.

> The jury were not required to accept the defendant's statement as to how the killing occurred simply because the defendant said it happened that way and no witnesses testified to the contrary. If from the improbability of his story and his manner of relating it, or from its contradictions within itself, or by the attending facts and circumstances, the jury are

convinced that he is not speaking the truth, they may reject his testimony, even though his reputation for truth is not attacked and he is not contradicted by other witnesses.

*Randolph*, 190 Va. at 263, 56 S.E.2d at 229 (citations omitted).

Bell obviously failed to convince the jury that the killing was justified or excusable. There was ample reason for the jury to reject the whole story as being insufficient to overcome the Commonwealth's *prima facie* showing of second-degree murder arising upon the proof that the defendant committed the homicide. *See Braxton* v. *Commonwealth*, 195 Va. 275, 279, 77 S.E.2d 840, 842 (1953).

## II.

 Bell next argued that the evidence disclosed as a matter of law that he acted in self-defense.

Homicide in self-defense may be either justifiable or excusable. If it is either, it entitles the prisoner to an acquittal. But if the difficulty is brought about by the accused and he finds that it is necessary to kill his assailant in order to save his own life, such killing is not in the eye of the law excusable. A man cannot go a-gunning for an adversary and kill him on the first appearance of resistance, and rely upon the necessity of the killing as an excuse therefor.

*Sims* v. *Commonwealth*, 134 Va. 736, 760, 115 S.E. 382, 390 (1922). To justify the slaying of another in self-defense, the defendant shall not have wrongfully occasioned the necessity. A man shall not in any case justify the killing of another by a pretense of necessity, unless he was without fault in bringing that necessity upon himself. *McCoy* v. *Commonwealth*, 125 Va. 771, 776, 99 S.E. 644, 645 (1919). In *Sims*, Justice Burks stated the general rule which, in view of the jury's verdict, is applicable here:

The general rule is that one cannot provoke an attack, bring on a combat, and then slay his assailant, and claim exemption from the consequences on the ground of self-defense. No one can avail himself of the plea of self-defense, in a case of homicide, or assault with intent to murder, when the defendant was himself the aggressor, and willfully brought on him-

self, without legal excuse, the necessity for the killing, or the assault made. He who provokes a personal encounter, in any case, thereby disables himself from relying on the plea of self-defense in justification of a blow which he struck during the encounter. *Where the defendant provoked the difficulty, it makes no difference as to what threats were made by the deceased, or what his character may have been for violence, or what may have been the danger to the defendant at the time he fired the shots. . . .* [I]n order that his act may be justifiable as in self-defense, the defendant must have been free from all fault or wrong-doing on his part which had the effect to provoke or bring on the difficulty.

134 Va. at 761-62, 115 S.E. at 390 (emphasis added).

Bell was not entitled to an acquittal as a matter of law. What Bell was entitled to and received were instructions on the subjects of reduction of the offense from murder to manslaughter and of self-defense if the jury believed him.

Bell had threatened to kill the decedent only a few hours prior to the shooting; he had armed himself with a loaded .380 pistol; he disregarded the pleas of the decedent and Patricia to leave them alone; when they tried to avoid him by moving their parking place, he aggressively sought them out; and while circling their vehicle as if it were a wagon train, he hurled insults at the decedent and challenged him to do something about it. When the decedent left his vehicle with his gun by his side, Bell still was seated behind the steering wheel of his van with its motor running. Although he easily could have driven off, he made no attempt to do so, but instead fired the shot which caused the fatal wound. On the total facts disclosed by this record, Bell cannot successfully maintain that a jury did not have a right to reject his claim of self-defense as to both justifiable and excusable homicide. Bell's evidence in support of his plea of self-defense was rejected by the jury and will not be disturbed on appeal.

### III.

Bell challenges the trial court's actions concerning the two self-defense instructions. First, he maintains that the excusable homicide instruction given was designed to confuse and mislead the jury because it failed to define "fault." Secondly, Bell argues that

the trial court erred when it refused an instruction he proffered which he maintains clarified the meaning of fault.

Pursuant to Bell's self-defense claim, the trial court instructed the jury on justifiable and excusable homicide. The excusable homicide instruction read as follows:

If you believe that the defendant was with some fault in provoking or bringing on the fight, and if you further believe that when attacked:
(1) he retreated as far as he safely could under the circumstances
(2) in a good faith attempt to abandon the fight; and
(3) made known his desire for peace by word or act; and
(4) he reasonably feared, under the circumstances as they appeared to him, that he was in danger of being killed or that he was in danger of great bodily harm, then the killing was in self-defense and you shall find the defendant not guilty.

Counsel for Bell did not object to this instruction being read to the jury. Absent such timely objection, we do not consider an issue raised on appeal. Rule 5A:18. Moreover, we note that the quoted instruction contains language virtually identical to the finding instruction on excusable homicide approved in *Perricllia* v. *Commonwealth*, 229 Va. 85, 93, 326 S.E.2d 679, 685-86 (1985).

Bell unsuccessfully proffered the following instruction which he maintains clarified the meaning of fault:

The Court has instructed you that a person who is the aggressor or provokes an encounter generally loses the right to self-defense. However, you are instructed that in this case, if you find from the evidence that the defendant, Richard Bell, had used some profanity in the encounter with Kenton Smith, and that he went upon the lot where Kenton Smith was parked, these factors alone do not in law, constitute or makes (sic) Richard Bell and (sic) aggressor thereby causing him to lose his right to self-defense. Further, the law is that words alone, however insulting, never is (sic) a sufficient provocation for one to lose his rights to self-defense. This is especially true if you find that the deceased, Kenton Smith,

had escalated the level of the conflict from words to the use of deadly force. Further, a defendant does not become an aggressor where he had made demands for an explanation from the deceased of the deceased's prior use of offensive words or conduct toward the defendant. Further, the defendant, Richard Bell, under the law does not become an aggressor by arming himself to repel the possibility of an attack upon his person. Further, the defense of self-defense under any circumstance is not lost to a person who provokes a person in a slight and minor manner, and the person provoked reacts to this slight provocation with such force that is grossly disproportionate to the provocation, thereby causing the alleged provoker to reasonably believe that he is in imminent danger of death or serious injury.

We hold that the trial court committed no error when it refused this instruction. The meaning of fault in excusable homicide is no different from the meaning of that word in its common usage. It encompasses any form of conduct on the part of an accused which a jury may reasonably infer from the evidence to have contributed to an affray. *Dodson* v. *Commonwealth*, 159 Va. 976, 981, 167 S.E. 260, 261 (1933); *see also Perricllia*, 229 Va. at 94, 326 S.E.2d at 685. The fact that the trial court did not give a definitional instruction concerning its meaning was not error. *Cf. Clark* v. *Commonwealth*, 220 Va. 201, 211, 257 S.E.2d 784, 790-91 (1979), *cert. denied*, 444 U.S. 1049 (1980).

Furthermore, the language of the quoted instruction proffered by the defense contains prohibited comments on the evidence and fails to provide any definition of fault. The instruction does not conform to its stated purpose and was properly refused.

Accordingly, finding no error in the judgment of the trial court, that judgment is affirmed.

*Affirmed.*

Barrow, J., and Hodges, J., concurred.