UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys,* Athey and Fulton
Argued at Norfolk, Virginia

SHAKEEM LAQUAN BRYANT

                                                    MEMORANDUM OPINION** BY
v.      Record No. 0022-23-1                        JUDGE CLIFFORD L. ATHEY, JR.
                                                    MARCH 5, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF SOUTHAMPTON COUNTY
Robert H. Sandwich, Jr., Judge

(James S. Ellenson, on brief), for appellant. Appellant submitting
on brief.

David A. Mick, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a five-day jury trial in the Circuit Court of Southampton County ("trial court"),

Shakeem Laquan Bryant ("Bryant") was convicted of first-degree murder and the use of a firearm in

the commission of a felony. On appeal, Bryant contends that "the Commonwealth's evidence failed

as a matter of law to exclude [his] reasonable hypothesis of innocence," and as a result he

challenges the sufficiency of the evidence to sustain his convictions.[1] We affirm.

---

* Judge Humphreys participated in the hearing and decision of this case prior to the
effective date of his retirement on December 31, 2023.

** This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] "A general objection to the sufficiency of the evidence should state with some
specificity the grounds of the objection." *Floyd v. Commonwealth*, 219 Va. 575, 584 (1978).
Since the substantive bases for Bryant's appeal are subsumed in his other assignments of error,
we do not separately address his general claim that the evidence is insufficient.

## I. BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

On the night of July 27, 2019, Bryant and his friend Robert Langston ("Langston") attended a party at a "shot house" in Franklin, Virginia.[2] Langston was armed with an "older model" revolver that Bryant had loaned to him. Bryant admitted at trial that he and Langston were planning to commit a robbery and that Bryant had loaned Langston the revolver for that purpose. At the shot house party, an altercation initially occurred between Langston and Jahlil Smith ("Smith"). Bryant subsequently intervened in defense of Langston but was overcome by several other individuals who began beating him. During the beating, Jack Taylor Sykes III ("Sykes") disarmed Langston and used the stolen revolver to strike Bryant in the head.

During the week after the altercation, Bryant attempted to discover the identity and location of the person who had struck him with his own revolver while also trying to replace the handgun. On August 4, 2019, after learning of Sykes's identity, Bryant learned that Sykes was living at the Dorchester Apartments in Franklin. Bryant then attempted unsuccessfully to borrow a firearm from an acquaintance known as "Blizzy," asking, "Yo. Can I get the [rifle] for like one hour. The N word that hit me wit da [revolver] in [Dorchester Apartments]." However, shortly thereafter, Bryant was able to secure a semiautomatic 9mm handgun from another friend, "Nino."

---

[2] A "shot house" is an "after hours" "unlicensed bar," often operating in a private residence.

- 2 -

Approximately 30 minutes later, Bryant arrived at the Dorchester Apartments and encountered Sykes in the ground floor entryway of one of the apartment buildings. Bryant shot Sykes at close range in the abdomen and upper right arm, killing him. Bryant immediately fled before purchasing a bus ticket shortly thereafter for New York City.

On the same date, in response to a call from the dispatcher that there had been "shots fired," Franklin Police Officer Muse ("Officer Muse") arrived at the Dorchester Apartments around 9:30 p.m. Officer Muse found Sykes lying on his back on the ground in a doorway at the rear of the building. Upon arrival, Sykes was still alive and breathing, having suffered two visible gunshot wounds. Officer Muse described Sykes as "in and out of consciousness" and unable to communicate with him. No firearm was recovered, and Sykes was subsequently declared dead at Southampton Memorial Hospital after having been transported by ambulance.

The next day, August 5, 2019, City of Richmond Police Officer Natoli ("Officer Natoli") responded to the scene of a shooting into an occupied apartment. When Officer Natoli arrived at the apartment that was shot into, Bryant was seated on a couch in the apartment. Bryant falsely identified himself to Officer Natoli as "King Brown" before providing a false date of birth, social security number, and home address. When asked to verify this false information, Bryant provided a different social security number, which proved to be that of a female.

Bryant was subsequently arrested. A firearm was seized after being found tucked into the couch cushions where Bryant had been seated. Law enforcement also recovered a new ski mask, gloves, and a bandana among Bryant's possessions. No cell phone or any identification were found.

At trial, Special Agent Nick Ivone ("Special Agent Ivone") of the Bureau of Alcohol, Tobacco, and Firearms testified as to the chain of custody of the seized firearm which he submitted to the Department of Forensic Science ("the Department") for analysis. Allison Milam ("Milam"), a tool mark examiner with the Department, further testified that the seized gun had fired the bullets

recovered during Sykes's autopsy as well as the cartridge cases recovered from the Dorchester Apartments on August 4, 2019.

Bryant's cousin Edward Leonard ("Leonard") also testified that upon encountering Bryant while both were in custody at the Western Tidewater Regional Jail, Bryant told him that Bryant had arranged for a sale of marijuana to Sykes at the Dorchester Apartments as a pretext to ambush and kill him in retaliation for the shot house altercation.

Bryant also testified in his own defense. He described the shot house altercation, including how Sykes had pistol whipped him with his own revolver. He further testified that the experience of being "hit in the face with a gun" triggered an intensified concern for his own safety, because he believed that Sykes had intended to shoot him with the revolver and had been dissuaded only by the presence of witnesses. Bryant denied any intention to seek revenge but admitted to inquiring about Sykes's identity.

Bryant further explained to the jury that he had borrowed a firearm on the day of the shooting after learning that Sykes would be at the Dorchester Apartments. He stated that although he only intended to visit that location, he felt that he needed to be armed in case he encountered Sykes or his friends while there. Bryant further claimed that when he initially encountered Sykes at the Dorchester Apartments, Sykes drew what looked like a "Glock handgun." Bryant asserted that he only drew his own gun in response, before firing first, and hitting Sykes twice. Bryant insisted that he shot Sykes because he "honestly believed that if I didn't shoot Mr. Sykes, that Mr. Sykes would have shot me." Bryant denied that he had lured Sykes to the Dorchester Apartments to ambush him.

On cross-examination, Bryant admitted that he began searching for a firearm online shortly after the shot house altercation and that he resumed that search when he learned that Sykes would be at the Dorchester Apartments on August 4, 2019. Bryant further admitted that within a half an hour

of him learning Sykes's location, Sykes was dead. Bryant further admitted that he fled the scene of the shooting and bought a bus ticket to New York City because he was considering fleeing the state.

At the conclusion of the evidence the trial court instructed the jury on the definition of first-degree murder, on the grades of homicide, and on self-defense. The jury convicted Bryant of first-degree murder and use of a firearm in the commission of a felony. Bryant appealed.

## II. ANALYSIS

### A. *Standard of Review*

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). A jury verdict "will not be set aside" on appeal unless "plainly wrong or without evidence to support it." *Meade v. Commonwealth*, 74 Va. App. 796, 805 (2022) (quoting *Wood v. Commonwealth*, 57 Va. App. 286, 292 (2010)); Code § 8.01-680.

B. *The trial court did not err in finding the evidence sufficient to sustain Bryant's conviction.*

1. Premeditation

Bryant argues that he "unexpectedly encountered Sykes and did not act with premeditation to kill." We disagree.

To secure a conviction for premeditated murder, the Commonwealth must prove "(1) a killing; (2) a reasonable process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Aldridge v. Commonwealth*, 44 Va. App. 618, 654-55 (2004) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989)). "To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder. The intent to kill must come into existence at some time before the killing; it need not exist for any particular length of time." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)). "Because 'premeditation and formation of an intent to kill seldom can be proved by direct evidence[, a] combination of circumstantial factors may be sufficient.'" *Aldridge*, 44 Va. App. at 655 (quoting *Rhodes*, 238 Va. at 486). This Court "will affirm a conviction of premeditated murder, even though based upon wholly circumstantial evidence, whenever . . . the reasonable import of such evidence, considered as a whole, is sufficient to show beyond a reasonable doubt that the accused . . . acted with a premeditated intent to kill." *Rhodes*, 238 Va. at 487.

In determining whether premeditation exists, "the jury may properly consider the brutality of the attack, and whether more than one blow was struck, the disparity in size and strength between the defendant and the victim, the concealment of the victim's body, and the defendant's lack of remorse and efforts to avoid detection." *Avent*, 279 Va. at 208 (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982)). In *Avent*, the Supreme Court upheld a

first-degree murder conviction where the evidence showed that the defendant pursued the victim after the initial "skirmish" had ended and the victim walked away. *Id.* The Supreme Court noted that the defendant admitted he was angry with the victim; it held that the brutality of the attack against the unarmed victim, the defendant's efforts to conceal the victim's body, his flight, and his lack of remorse when the police interviewed him were circumstances that supported the jury's finding of premeditation. *Id.* at 208-09; *cf. Battle v. Commonwealth*, 24 Va. App. 440, 445 (1997) (holding that testimony establishing the defendant's animus toward the victim and his use of a "ruse" to trick the victim was "highly probative" of premeditation and the intent to kill).

Here, the record is replete with evidence supporting the jury's verdict. In the light most favorable to the Commonwealth, the record reflects that while nursing a grudge against Sykes after being pistol-whipped in the shot house, Bryant sought both his identity and location: quite literally hunting him down. For example, when Langston texted that he "tast[ed] blood" over the incident, Bryant replied "as do I," but admonished Langston not to act rashly because "there is a time and place for everything." Once he learned Sykes's identity and location, Bryant armed himself— despite being a convicted felon prohibited from owning guns—and employed a ruse to lure Sykes into an ambush. At the Dorchester Apartments, Bryant shot the unarmed Sykes twice at close range. "Shooting the victim 'at close, and thus predictably fatal, range'" is noted as a "circumstance[] most commonly associated with first-degree murder." *Kirby v. Commonwealth*, 50 Va. App. 691, 701 (2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 325 (1979)).

Bryant then fled the scene and purchased a bus ticket to New York. On the day after the murder, Bryant, still armed with the murder weapon, gave the police a false name and social security number. Actions such as "an accused's flight, . . . concealment, assumption of a false name, and related conduct are admissible as evidence of consciousness of guilt, and thus of guilt itself"; thus, Bryant's actions here evinced his consciousness of guilt. *See Palmer v.*

*Commonwealth*, 14 Va. App. 346, 348-49 (1992) (quoting *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991)). Given the totality of the evidence, we conclude that a "rational trier of fact could have found" premeditation "beyond a reasonable doubt.'" *Vasquez*, 291 Va. at 248.

### 2. Malice

For the first time on appeal, Bryant argues that he did not possess the requisite malice aforethought to kill Sykes. For the following reasons, we decline to reach the merits of this argument.

Under settled precedent, "[a] party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory. Nor may a party invite error and then attempt to take advantage of the situation created by his own wrong." *Rowe v. Commonwealth*, 277 Va. 495, 502 (2009) (alteration in original) (quoting *Cangiano v. LSH Bldg. Co.*, 271 Va. 171, 181 (2006)). A litigant is not "permitted to 'disavow[] on appeal the very argument [he] made at trial.'" *Bethea v. Commonwealth*, 297 Va. 730, 753 n.9 (2019) (second alteration in original) (quoting *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 204 (2016)). This doctrine "protect[s] a basic tenet of fair play: No one should be permitted, in the language of the vernacular, to talk through both sides of his mouth." *Id.* (quoting *Wooten v. Bank of Am., N.A.*, 290 Va. 306, 310 & n.2 (2015)).

Hence, when Bryant moved to strike at the close of the Commonwealth's evidence, he argued that "the evidence was insufficient as a matter of law and a matter of fact" to support a first-degree murder conviction. He also requested the trial court to "consider moving forward" on second-degree murder and the use of a firearm, conceding that "there's a presumption of malice [where] a firearm was used" and that "[c]learly a firearm was used in this case." He also only contended that the Commonwealth had adduced insufficient evidence to show premeditation and that, therefore, the trial court should strike the first-degree murder charge and proceed only on a

second-degree murder charge. Thence, when further acknowledged that "[The Commonwealth] has met [its] burden at this stage for second-degree and use of a firearm," "[b]ut for first-degree murder, I think there's just simply a lack of premeditation on the part of the defendant," at a minimum, he inferred that there was sufficient evidence to establish malice. In addition, after the trial court overruled the motion, Bryant chose to testify in his own defense. Following his testimony, Bryant simply renewed his motion to strike "on the same grounds" and "the same argument" at the close of all the evidence, which the trial court again overruled. Bryant failed to move to set aside the verdict.

Thus, at no point did Bryant argue the absence of malice to the trial court and he may not do so now. "A matter not in dispute before the trial court will not be considered for the first time on appeal[.]" *Commonwealth, Dept. of Soc. Servs., Div. of Child Support Enf't, ex rel. Breakiron v. Farmer*, 32 Va. App. 430, 437 (2000) (alteration in original) (quoting *Connelly v. Commonwealth*, 14 Va. App. 888, 891 (1992)).

### 3. Self-Defense

Bryant argues that he acted in self-defense when repeatedly shooting and killing Sykes and that the evidence was sufficient to create a reasonable doubt. For the following reasons, we disagree.

"Self-defense is an affirmative defense to a charge of murder, and in making such a plea, a 'defendant implicitly admits the killing was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors.'" *Commonwealth v. Sands*, 262 Va. 724, 729 (2001) (quoting *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978)). "Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact." *Meade*, 74 Va. App. at 807 (quoting *Bell v. Commonwealth*, 66 Va. App. 479, 486 (2016)). Thus, a jury's "'factual findings' regarding a claim

of self-defense 'will not be disturbed on appeal unless plainly wrong or without evidence to support them.'" *Id.* (quoting *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993)).

"[S]elf-defense turns on the right to respond to an overt act that creates an '*imminent danger.*' What was said and done before this imminent danger may be relevant background, but it is not dispositive on the question of self-defense.'" *Colas v. Tyree*, ___ Va. ___, ___ (Jan. 26, 2023) (emphasis added). "The 'bare fear' of serious bodily injury, or even death, however well-grounded, will not justify the taking of human life. 'There must [also] be some overt act indicative of imminent danger at the time.'" *Sands*, 262 Va. at 729 (alteration in original) (first quoting *Stoneman v. Commonwealth*, 66 Va. 887, 900 (1874); and then quoting *Vlastaris v. Commonwealth*, 164 Va. 647, 652 (1935)).

Bryant testified that he shot Sykes in self-defense. However, the jury rejected that claim and convicted him of first-degree murder. Bryant testified that he feared for his safety after the shot house incident because he believed that Sykes would have shot him but for the presence of witnesses, and he "wasn't sure if [Sykes's] intentions . . . was to harm [him] more." Bryant argues that Sykes made such an overt act when he drew what Bryant thought was a Glock semiautomatic handgun. He claimed that he shot Sykes "because [he] honestly believed that if [he] didn't shoot Mr. Sykes, that Mr. Sykes would have shot [him]." But the police did not find a firearm on Sykes's person, and the jury was "entitled to disbelieve the self-serving testimony of the accused." *Johnson v. Commonwealth*, 73 Va. App. 393, 399 (2021) (quoting *Marsh v. Commonwealth*, 57 Va. App. 645, 655 (2011)). Based upon the record before us, the jury reasonably concluded that Bryant's claimed self-defense was his way to cover-up his act of revenge. "A man cannot go a-gunning for an adversary and kill him on the first appearance of resistance, and rely upon the necessity of the killing as an excuse therefor." *Commonwealth v. Bell*, 2 Va. App. 48, 55 (1986) (quoting *Sims v. Commonwealth*, 134 Va. 736, 760 (1922)).

## III. CONCLUSION

The evidence in the record permitted a rational jury to conclude that Bryant acted with malice and premeditation, and without justification when he shot and killed Sykes.  The trial court's judgment is therefore affirmed.

*Affirmed*.